United States Court of Appeals
Fifth Circuit

**F I L E D**

**January 24, 2007**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

No. 05-41611

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ROSA MARIA HERNANDEZ,

Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of Texas

Before HIGGINBOTHAM, SMITH, and DeMOSS, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Defendant Rosa Hernandez argues that no reasonable suspicion supported the stop of her car by a roving patrol approximately eighteen miles from the Rio Grande. We affirm.

I

The Laredo North Border Patrol Station is located 15 miles north of Laredo on I-35, south of the intersection of I-35 and US 83.[1] US 83, a mostly north-south road, is a notorious alien smuggling route; aliens follow ranch or county roads or walk about six hours through the desert from the Rio Grande, approximately

_____

[1] US 83 and I-35 merge in Laredo but split about 20 miles north of the city. "Intersection" refers to this northern split.

eighteen miles away, for pickup by smugglers on US 83, north of any checkpoint.

Border Patrol Agent Nicholas Lopez spent his 17-year career at the Laredo North Station doing roving patrols along US 83. Between 3:00 p.m. and 11:00 p.m. on Sunday, January 30, 2005, he and a partner were on roving patrol. Agent Antonia Parra, with two-years' experience on such patrols, was on similar patrol in a different area with his partner. These roving patrols also lay up where aliens might join smugglers, track the brush, and respond to tips.

At about 8:45 p.m., an anonymous tipster called the Laredo North Checkpoint facility, out of which the roving patrols were based, and reported that two vehicles, a red Suburban and a red pickup truck, had just stopped at the Long Branch Saloon on US 83, picked up a load of illegal aliens, and headed north. The Saloon was a mile north of the intersection of I-35 and US 83. It was a well-known rendezvous spot, with a nearby lay-up area often littered with personal effects and food left by illegal aliens. The tip was relayed over the radio.[2] Lopez, who was driving south on US 83 and had just passed the Saloon, turned around and headed north toward the Saloon. When he reached it, he noticed four or five vehicles in the parking lot, none matching the tipster's

---

[2] The origins of the tip and the relay to the patrols are unclear. The significant fact is that the tip was directed to the Laredo North Checkpoint facility.

description.  He continued north, turning on his lights, as he claims to alert other officers to his presence and to avoid being stopped for speeding.

When Parra heard the call, he drove from a side road to US 83 and headed north himself.[3]  After about three to five minutes, he encountered a red Suburban driving north.  The Suburban pulled over and stopped on its own; Parra hadn't turned on his light or otherwise pulled the car over.  Parra thought the occupant needed assistance, so he pulled over and approached the car.  He talked with the driver, Esteban Herndandez-Ramirez, who offered no explanation for pulling over and stopping.  At Parra's request, Esteban produced his green card, and he told Parra that he was returning from Laredo after dropping off his wife at a bus station.  He claimed that his wife was traveling by bus into Mexico and that he was heading home back to Houston.  Presumably there was no one else in the car.  Around this time, Parra ran a registration check on the Suburban.  Thinking Esteban's explanation odd since I-35 was a better route to Houston, Parra asked Esteban why he was on US 83.  Esteban claimed to have stopped to purchase a bag of chips.  After Parra's supervisor, Agent Luis Jimenez, arrived on the scene, Jimenez asked Esteban for his driver's license.  Jimenez checked the license.  When the registration came back clean, Esteban was allowed to leave and Jimenez set out to join Lopez further north on

_____

[3] The relative locations of the stops by Parra and Lopez are unclear, but they are irrelevant to this appeal.

3

US 83.  Parra also drove north.

While traveling north on US 83, Lopez passed two or three cars, none of which were red or pickups, which moved to the shoulder to allow Lopez to pass.  About five to seven minutes and ten miles since driving past the Saloon, about the same time that Parra pulled over Esteban, Lopez encountered a red pickup.  It too pulled over, and Lopez pulled over behind it and approached.  The driver, defendant Rosa Hernandez, gave Lopez her green card.  Lopez found four illegal aliens in the pickup.  Hernandez told Lopez that she stopped at the Saloon parking lot when the four aliens inexplicably jumped in her pickup.  As Lopez was talking with Hernandez, Jimenez arrived and Parra drove on past.

When Jimenez learned of Hernandez's identity, he immediately radioed to Parra, suspecting that Rosa and Esteban were married.  The two men discussed the issue.  Jimenez told Parra to stop Esteban.  He did so, asking Esteban if Rosa was his wife and if they were smuggling aliens.  He admitted both.

Esteban and Rosa were eventually charged with aiding and abetting the transportation of two illegal aliens for financial gain.  The district court denied their motions to suppress, noting especially that there was no evidence of other red trucks in the area.  After a bench trial, the district court found defendants

guilty.[4]  The PSR recommended six to twelve months' imprisonment for both defendants, but Judge Alvarez sentenced them to only three years' probation with six months home detention.  Rosa appeals.[5]

## II

Where, as here, the facts are undisputed, we review *de novo* the lower court's legal conclusion that reasonable suspicion supported the stop.[6]

> Border Patrol agents on roving patrol may stop a vehicle when they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the particular vehicle is involved in illegal activity. *See United States v. Brignoni-Ponce*, 422 U.S. 873, 884, 95 S.Ct. 2574[] (1975); [*United States v. ]Villalobos*, 161 F.3d [285,] 288 [(5th Cir. 1998)]. Factors that may be considered include: (1) the characteristics of the area in which the vehicle is encountered; (2) the arresting agent's previous experience with criminal activity; (3) the area's proximity to the border; (4) the usual traffic patterns on the road; (5) information about recent illegal trafficking in aliens or narcotics in the area; (6) the appearance of the vehicle; (7) the driver's behavior; and, (8) the passengers' number, appearance and behavior. *See Brignoni-Ponce*, 422 U.S. at 884-85, 95 S.Ct. 2574. Reasonable suspicion requires more than a mere unparticularized hunch, but considerably less than proof by a preponderance of the evidence. *See United States v. Gonzalez*, 190 F.3d 668, 671 (5th Cir. 1999). No

---

[4] In her motion to suppress, Hernandez stated that the tipster said the truck was maroon while her truck was red.  In orally arguing that motion, however, everyone, including Hernandez, said the tip identified a red truck. Then just before trial, the parties stipulated that the tipster said the truck was maroon.  Neither party mentioned the discrepancy in its brief or at oral argument, both referring the tip as about a red truck.  Accordingly, we give the discrepancy no significance.

[5] We dismissed Esteban's appeal after he failed to pay for the appeal or seek *in forma pauperis* status.

[6] *See United States v. Portillo-Aguirre*, 311 F.3d 647, 651-52 & n.6 (5th Cir. 2002).

single factor is determinative; the totality of the particular circumstances known to the agents are examined when evaluating the reasonableness of a roving border patrol stop. *See United States v. Morales*, 191 F.3d 602, 604 (5th Cir. 1999)[]; *Villalobos*, 161 F.3d at 288.

The characteristics of the area in which the vehicle was encountered and the area's proximity to the border are important considerations in the reasonableness determination. *See Villalobos*, 161 F.3d at 288-89. Proximity to the border has been recognized by this court as a factor supporting reasonable suspicion, even when the vehicle is more than the benchmark fifty miles from the border. *See Gonzalez*, 190 F.3d at 672 (citing *Villalobos*, 161 F.3d at 289). Close proximity to the border is not required if other specific articulable facts support a finding of reasonable suspicion. *See United States v. Aldaco*, 168 F.3d 148, 150 (5th Cir. 1999).[7]

An anonymous tip may provide the reasonable suspicion.[8] Factors to be considered are: "(1) the credibility and reliability of the informant; (2) the specificity of the information contained in the tip or BOLO report; (3) the ability of the officers in the field to verify the information in the field; and (4) whether the tip deals with active or recent activity."[9] "[A]n informant's 'veracity,' 'reliability,' and 'basis of knowledge'...[are] 'highly relevant in determining the value of his report.'"[10]

Hernandez notes that Lopez conceded that US 83 is a major highway and that he noticed nothing suspicious about the vehicle

---

[7] *United States v. Ceniceros*, 204 F.3d 581, 584 (5th Cir. 2000).

[8] *Id.*

[9] *United States v. Perkins*, 352 F.3d 198, 200 (5th Cir. 2003).

[10] *Alabama v. White*, 496 U.S. 325, 327-29 (1990) (internal citations omitted).

itself or its passengers; she acknowledges that proximity to the border is a factor, but she reminds that proximity isn't dispositive and argues it is less important where the defendant is stopped in a populated area. Consequently, she argues, whatever suspicion Lopez had came almost exclusively from the anonymous tip. And that tip, she continues, was insufficient because it was too vague. The argument continues that Lopez admitted that red cars and trucks wouldn't be unusual on US 83 or at the Saloon around 9:00 p.m., that nothing validated the tip: Lopez saw nothing unusual at the Saloon, there was no prediction of future behavior,[11] and there was no other corroboration. In short, she argues, Lopez had only a bare tip about a red pickup and stopped the first red pickup he encountered.[12]

---

[11] *See United States v. Roch*, 5 F.3d 894, 896 (5 Cir. 1993) (holding that such a prediction shows reliability).

[12] She compares her case to several others, arguing that her case presents less suspicion than all of them. *See White*, 496 U.S. at 329 (holding that a tip that White would be leaving a particular location in a particular car traveling to a particular location was sufficient, although presenting a "close case"); *United States v. Jaquez*, 421 F.3d 338, 340 (5th Cir. 2005) (holding that a radio dispatch about a "red vehicle" being involved in a shooting incident in a certain area was insufficient to support the stop of a red car in that area fifteen minutes later); *United States v. Lopez-Gonzalez*, 916 F.2d 1011 (5th Cir. 1990) (finding reasonable suspicion based on a tip that two vehicles would begin at a certain location near the river and travel a certain route, and agents saw that occur after people loaded bales and sacks into the car before leaving); *Ceniceros*, 204 F.3d at 585 (finding reasonable suspicion based on a tip that a white 90s model Chevy Lumina would be traveling on Highway 118 from Lajitas, Texas, driven by a lone hispanic male, and the agent, after seeing such a car, ran the license plate and discovered that it was registered to a white woman in Dallas, noticed no Big Bend National Park permit sticker, as many cars in that area had, observed speed fluctuations and drift, suggesting concern about the agent, and noticed that the car appeared to be heavily loaded in the back); *United States v. Roch*, 5 F.3d 894, 898 (5th Cir. 1993) (finding no reasonable suspicion based on a tip from an informant reliable in the past that a white male named Frank was driving an orange and white truck and staying at a certain hotel with his girlfriend, and the police saw a white male leave the hotel with a white

We conclude that reasonable suspicion supported the stop. These events played out in an area close to the border and a notorious alien smuggling route. Moreover, the tip itself was not bare. The tipster call was a rifle-shot to the nearest checkpoint facility, out of which the roving patrols were based, as opposed to any other office in the Laredo Sector, suggesting familiarity with the Border Patrol and knowledge and experience with reporting illegal activity.[13] The tipster claimed to have seen the smuggling firsthand just moments before the call, and the Long Branch Saloon, it will be recalled, was next to a well-known lay-up area for illegal aliens, facts which point to a knowledgeable tipster. There was more. The tip provided the color, number, and type of the vehicles - a red truck and a red Suburban - and that description was validated when Lopez encountered Hernandez. The totality of the circumstances provided reasonable suspicion to stop Maria Hernandez.

AFFIRMED.

---

woman in an orange and white truck).

[13] At oral argument, Hernandez contended that we could not rely on any reliability stemming from this fact because Agent Lopez didn't know what number the tipster called. However, in assessing whether an agent had reasonable suspicion, we look to the "collective knowledge" of all agents and officers. *See United States v. Ervin*, 907 F.2d 1534, 1539 (5th Cir. 1990).