# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 18-50941

United States Court of Appeals
Fifth Circuit

**FILED**
October 11, 2019

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

      Plaintiff - Appellee

v.

JAVIER FERNANDO CHAPARRO-LUNA,

      Defendant - Appellant

Appeal from the United States District Court
for the Western District of Texas
USDC No. 4:18-CR-41-1

Before SOUTHWICK, WILLETT, and OLDHAM, Circuit Judges.

PER CURIAM:*

A jury convicted Javier Chaparro-Luna of aiding and abetting importation of 50 to 100 kilograms of marijuana. On appeal, he challenges three district court evidentiary decisions and argues that prosecutorial misconduct requires reversal. We AFFIRM.

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 18-50941

FACTUAL AND PROCEDURAL BACKGROUND

On January 31, 2018, and in the early hours of February 1, 2018, United States Border Patrol Agent Arturo Carrillo operated a thermal viewing device near Van Horn, Texas. That night, Agent Carrillo saw three individuals walking north in an area often used for smuggling drugs from Mexico. Based on the heat signatures, it appeared to Carrillo that the people were carrying large backpacks that must have been rather heavy because they were leaning forward due to the weight on their backs. Agent Carrillo believed the backpackers were almost certainly carrying marijuana or other narcotics. He immediately called his supervisor. Nearby Border Patrol agents began tracking the three backpackers.

Agent Carrillo kept watching the three backpackers on the thermal device and guided the other agents to where the backpackers had crossed a road. The agents found shoeprints and were able to begin tracking the backpackers. As the agents got close to them, the backpackers abandoned their loads and began running. The agents found bags of marijuana and stopped their chase to secure the drugs. Two of the three backpackers ran toward the mountains. The third backpacker lingered. Agent Carrillo determined that the third backpacker was the one hiding in the thick brush.

After several hours of continued surveillance, an individual emerged from the brush where Agent Carrillo believed a backpacker had been hiding. Agent Carrillo radioed another Border Patrol Agent, Julio Chavez, who was then able to locate and arrest this backpacker, who was the defendant, Chaparro. The agent asked Chaparro for the location of the rest of the group. According to Agent Chavez, Chaparro replied, "They left me" and "[h]e couldn't keep up no more. He was tired already." Agent Chavez took Chaparro to an area where the three backpackers had been walking earlier that evening. Agent Chavez compared the shoes that Chaparro had on to the shoeprints in

2

the dirt. He believed the prints could have been made by Chaparro's shoes. Chaparro was then taken to the Van Horn Station for further questioning.

Border Patrol Agent George Talavera informed Chaparro of his rights, and Chaparro signed a waiver of rights. He answered several questions, but once Drug Enforcement Agency ("DEA") agents joined in the questioning, he invoked his right to counsel. That invocation ended the questioning. Later that day, Chaparro asked to see Agent Talavera in order to talk further with him. Chaparro signed a second waiver before any further interrogation. Both Agent Talavera and Chaparro testified at trial, giving different accounts as to what was said during the interrogations.

Chaparro was found guilty of aiding and abetting the importation of 50 to 100 kilograms of marijuana. The district court sentenced him to three years of imprisonment and three years of supervised release. On appeal, Chaparro challenges three evidentiary rulings: the admission of Chaparro's confession, the exclusion of foreign depositions, and the exclusion of testimony by his expert. Chaparro also argues that prosecutorial misconduct merits reversal.

## DISCUSSION

### I.    *Chaparro's motion to suppress his confession*

When analyzing a district court's denial of a motion to suppress, we review factual findings for clear error; we review *de novo* the legal conclusion that a confession was voluntary. *United States v. Escamilla*, 852 F.3d 474, 480 (5th Cir. 2017). "We view the evidence in the light most favorable to the prevailing party," here, the Government. *Id.* The Government must prove voluntariness by a preponderance of the evidence. *United States v. Reynolds*, 367 F.3d 294, 297–98 (5th Cir. 2004). "The voluntariness of a confession depends on whether, under the totality of the circumstances, the statement is the product of the accused's free and rational choice." *Id.* at 298.

No. 18-50941

Before trial, Chaparro moved to suppress Agent Talavera's account of their second conversation. He also requested an evidentiary hearing. During the pretrial conference, the district court concluded that Chaparro incorrectly styled his motion to suppress as a motion *in limine* and was untimely in filing it. The district court also concluded that it was undisputed that Chaparro signed a second waiver before the second interrogation. The district court denied the motion to suppress.

Chaparro argues that the district court erred in finding his motion untimely and in failing to hold an evidentiary hearing to determine whether his confession was voluntary. We "may affirm the district court's ruling for any reason supported by the record." *Escamilla*, 852 F.3d at 480. It thus is not necessary to analyze timeliness. We will consider only the merits of the motion to suppress along with the denial of an evidentiary hearing.

A district court must determine outside the jury's presence that a confession was voluntary before it may be presented to jurors. *Jackson v. Denno*, 378 U.S. 368, 377, 395 (1964). A defendant may request an evidentiary hearing on the issue of voluntariness by moving to suppress the confession. The court will be required to hold an evidentiary hearing if the motion or affidavits supporting the motion allege "sufficient facts which, if proven, would justify relief." *United States v. Harrelson*, 705 F.2d 733, 737 (5th Cir. 1983). The alleged facts must be "sufficiently definite, specific, detailed, and nonconjectural." *Id.* Even without a motion, "when the evidence clearly reflects a question of the voluntariness of a confession, the trial court must raise the issue on its own motion." *United States v. Guanespen-Portillo*, 514 F.3d 393, 402 (5th Cir. 2008). We review a denial of an evidentiary hearing for abuse of discretion. *Harrelson*, 705 F.2d at 737.

We first consider Chaparro's motion. It was brief, made no assertions of facts at all, and argued simply that the court had to exclude confessions that

4

No. 18-50941

violated *Miranda v. Arizona*, 384 U.S. 436 (1966).  Because the motion made no factual allegations and attached no affidavit or other form of evidence, it was insufficient to warrant an evidentiary hearing.

As to whether the evidence before the district court clearly reflected a question of the voluntariness of Chaparro's confession, the record reveals that the pretrial conference was the first time the district court was presented with arguments about voluntariness.  Chaparro's counsel orally argued the motion but presented no evidence.  Evidence, not mere allegations, must clearly present a question of voluntariness.  *Guanespen-Portillo*, 514 F.3d at 402.  No evidence at the pretrial conference raised a question of voluntariness because there was no evidence.  Counsel's statements do not substitute.  *United States v. Vaccaro*, 115 F.3d 1211, 1218 (5th Cir. 1997).

We now examine the evidence presented at trial.  Agent Talavera testified about his first conversation.  He handed Chaparro a written form of Chaparro's *Miranda* rights.  Chaparro read it and did not have any questions.  Agent Talavera then asked Chaparro if he was willing to talk to him.  Chaparro said he was and signed a waiver of rights.  Agent Talavera then asked Chaparro questions about how he entered the United States.

According to Agent Talavera, Chaparro told him that he had separated from two other people who had left him once he crossed the border.  A cousin recruited him to bring a backpack of marijuana into the United States.  If he successfully imported the marijuana, Chaparro said he was promised a job in oil fields near Odessa, Texas.  He could not afford to pay someone to get him over the border without having to carry drugs, so this was his only option to enter the United States.

Chaparro also told Agent Talavera that, initially, 10 people had set out to cross the border.  They later separated into smaller groups that crossed in staggered patterns to avoid capture.  They planned to meet at some point to

drop off the marijuana in an area near Interstate 10, around the location where Chaparro was seized by the Border Patrol.  Once they became aware of Border Patrol agents, they scattered.

Chaparro also added details about drug operations in Mexico.  He told Agent Talavera that he had secretly filmed a plane of narcotics landing in the Mexican city of Coyame.  He said if the Border Patrol could find his bag that he dropped containing water and his cell phone, then they would find the video.  This bag was never recovered.

At some point, the first conversation ended, and DEA agents arrived to question Chaparro about the marijuana.  Chaparro refused to speak with those agents.  Agent Talavera and the DEA agents then stopped all questioning.  The DEA agents left, and Agent Talavera went back to his office in the same facility in which Chaparro was held.

Agent Talavera also testified as to the second interrogation, stating that later that same day, Chaparro told another agent that he wanted to talk again with Agent Talavera.  Agent Talavera asked Chaparro, "What's going on?"  Chaparro responded, "I want to talk to you some more."  Agent Talavera then typed an addendum in both English and Spanish that acknowledged that Chaparro "had invoked [his] right to request an attorney" with the DEA, but that he "agree[d] to speak with Border Patrol without the presence of a lawyer."  Chaparro signed the addendum.  In recounting what Chaparro said, Agent Talavera did not clearly differentiate between the first and the second interrogations.

Chaparro also gave his own account of both interrogations.  As to the first, Chaparro testified that he agreed to speak with Agent Talavera, but that he told him only about what happened in Mexico.  As to the second, he testified that when Agent Talavera returned, he gave Chaparro the new waiver of rights.  Chaparro insisted he said nothing to Agent Talavera after signing the

waiver. Chaparro did not contradict the testimony that Agent Talavera gave a *Miranda* warning, that Chaparro signed the first waiver, and that he initiated the second conversation. Chaparro admitted that he signed the second waiver. What Chaparro did dispute was confessing to any actions in the United States.

When a defendant disputes having made a confession at all, the focus is no longer on voluntariness. *Guanespan-Portillo*, 514 F.3d at 404. We conclude that nothing in the record raises the specific issue of voluntariness, and therefore there was no basis to claim error when the district court did not *sua sponte* decide to hold a hearing on that question. *See id.* Instead, jurors were the ones who needed to decide whether to believe Agent Talavera's testimony that Chaparro had confessed at all. *See United States v. Williams*, 343 F.3d 423, 438 (5th Cir. 2003).

On appeal, Chaparro says there is a fact question as to who initiated the second conversation. He then argues that because a detainee who has invoked the right to counsel cannot later waive that right unless the detainee initiates further interrogation, the confession should have been suppressed. *See Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981). The problem with that argument is that there was no evidence or even assertion at the pretrial conference or at trial to contradict Agent Talavera's account that Chaparro initiated the second conversation. That fact remained undisputed until appeal. It is too late to raise the *Edwards* issue, as I cannot be raised for the first time on appeal. *Guanespen-Portillo*, 514 F.3d at 402. It was not.

Chaparro also makes a one-sentence argument that Agent Talavera's testimony as to the second conversation contradicts a report he wrote about his interview with Chaparro. The report does not indicate Chaparro and Talavera spoke twice. Instead, the report contains the core of the factual allegations to which Chaparro allegedly confessed. The report is better characterized as

incomplete as opposed to contradictory. Regardless, the district court was not put on notice of a question of voluntariness.

The district court did not abuse its discretion by not holding an evidentiary hearing.

## II.    *Chaparro's motion for foreign depositions*

According to the Federal Rules of Criminal Procedure, "[a] party may move that a prospective witness be deposed in order to preserve testimony for trial. The court may grant the motion because of exceptional circumstances and in the interest of justice." FED. R. CRIM. P. 15(a). Circumstances may be sufficiently exceptional when a witness cannot be served, is unlikely to return to the United States, and the prospective testimony is material to the moving party's case. *United States v. Dillman*, 15 F.3d 384, 389 (5th Cir. 1994).

Chaparro sought to depose members of his family who would testify that he borrowed money from them to pay someone to guide him to the United States illegally. The district court found that although Chaparro's family was probably unavailable, the testimony would not be material. The court denied the motion. Chaparro argues that this denial was in error because the evidence was "critical" to his defense. He argues that his family's testimony would indicate that he had a motive and means to come to the United States with the assistance of a smuggler and would not have had to carry the marijuana to enter the United States.

In the precedent on which Chaparro principally relies, we reversed a district court's refusal to permit a foreign deposition. *United States v. Farfan-Carreon*, 935 F.2d 678, 681 (5th Cir. 1991). The defendant, Farfan-Carreon, was arrested after marijuana was found concealed in his truck. *Farfan-Carreon*, 935 F.2d at 679. He contended that he had no knowledge of the marijuana. *Id.* To prove this, he sought to depose the man who gave him the

truck. *Id.* The man allegedly would say that Farfan-Carreon had no knowledge of the marijuana when he was given the truck. *Id.* We held that the potential testimony bore directly on Farfan-Carreon's knowledge and was therefore material. *Id.* at 680.

In contrast, Chaparro sought depositions to bolster only one part of his story, namely, that he asked for and received money from his family. Unlike *Farfan-Carreon*, where the defendant alleged a single fact that would contradict an element of his charged crime and had a single witness who could testify to it, Chaparro sought deposition testimony that even if true would not categorically exculpate him.

Moreover, even if this prospective testimony were material, any error committed by the district court was harmless. The confession and the accounts of the Border Patrol agents were sufficient to outweigh any deposition alleging that Chaparro had received money from his family. This overwhelming evidence of guilt makes it highly unlikely that the prospective testimony would have had any impact on the verdict. *See United States v. Bello*, 532 F.2d 422, 423 (5th Cir. 1976).

## III.   *Chaparro's expert witness*

Chaparro sought to introduce a photogrammetry expert to analyze photographs taken by a Border Patrol agent of shoeprints found the morning of February 1, 2018. According to the record, photogrammetry is the analysis of data extracted from photographs and other images. When Agent Chavez encountered Chaparro, he compared the soles of Chaparro's shoes to the shoeprints in the dirt and determined they were the same. Chaparro's expert would testify that Chaparro's shoes were not the ones that made the prints in the photograph. The Government argued for excluding the testimony, saying it first learned of the photogrammetry expert five days before the start of trial.

No expert report had yet been provided, though defense counsel orally summarized the testimony.  The district court in its oral ruling seemed primarily to rely on the late notice of the testimony as a basis for its exclusion, but the court also apparently accepted the Government's argument that the witness was not shown to be an expert in analyzing photographs.

On appeal, Chaparro makes two arguments challenging the exclusion. First, he asserts that his constitutional right to present a defense was infringed by the exclusion of his expert.  Second, Chaparro contends that the district court erred in failing to qualify Chaparro's expert.

We see no constitutional issue here.  Chaparro failed to follow the requirements of Federal Rule of Criminal Procedure 16, which include providing at request a summary of expert testimony if the Government complies with a similar defense request, and the Rule also allows exclusion of evidence that has not been properly disclosed.  FED. R. CRIM. P. 16(b)(1)(C), (d)(2)(C).  We have upheld the exclusion of expert testimony for a defendant's failure to provide a written summary of the testimony.  *United States v. Lundy*, 676 F.3d 444, 451 (5th Cir. 2012).  The district court's additional determination that the witness was not shown to be qualified to give expert testimony is an invocation of the demands of Federal Rule of Evidence 702, which requires such a determination before allowing testimony of a proposed expert.

There is much in the briefing about these rules.  We will not address the parties' arguments because any error by the district court would be harmless. After Agent Chavez gave his testimony about his perception that the shoeprint and Chaparro's shoes matched, jurors were informed of significant problems with the comparison.  On cross-examination, Agent Chavez testified he could not remember what the shoeprints looked like.  Agent Talavera testified he never looked at Chaparro's shoes or tried to confirm the prints.  Agent Carrillo testified he never looked at the shoeprints.  Thus, the jury heard significant

evidence about weaknesses in the Government's shoeprint-identification theory.

Even more importantly, Chaparro undoubtedly had been walking either by himself or with others in this remote area near the border. He confessed to his purpose. Regardless of whether the discovered shoeprint was from his shoes or someone else's, he was in that general location. Consequently, this overwhelming evidence of guilt makes it highly unlikely that the exclusion of the expert's testimony would have had any impact on the guilty verdict. *Bello*, 532 F.2d at 423.

## IV.   *Prosecutorial misconduct*

Chaparro argues that the prosecutor at trial made prejudicial comments in a cross-examination and in closing argument. Because Chaparro did not object to the prosecutor's statements at trial, we review for plain error. *United States v. Aguilar*, 645 F.3d 319, 323 (5th Cir. 2011).

On cross-examination, the prosecutor asked Chaparro if Agent Talavera "had made up all that stuff you heard about yesterday." That was error because a prosecutor is not to question a defendant about another witness's veracity. *See Williams*, 343 F.3d at 437. To reverse for plain error, the comment must have "affected the substantial rights of the defendant." *Id.* Our analysis considers "(1) the magnitude of the prejudicial effect of the prosecutor's remarks, (2) the efficacy of any cautionary instruction by the judge, and (3) the strength of the evidence supporting the conviction." *Id.*

First, the magnitude of the remark is small. The prosecutor's cross-examination had led Chaparro to contradict directly the testimony of Agent Talavera. Chaparro had already implicitly called the agent a liar. We have previously held that the prejudicial effect of a remark like this is small. *Id.* Second, the district court correctly instructed jurors that questions of

credibility were theirs to decide. *See Williams*, 343 F.3d at 438. Third, the evidence against Chaparro was strong. We conclude that the prosecutor's remark did not impact Chaparro's substantial rights.

Chaparro also challenges a question and two fact statements made by the prosecutor in closing arguments. After the prosecutor recounted Chaparro's side of the story, he rhetorically asked: "Does that story make any sense, ladies and gentlemen?" Chaparro contends the question amounts to a suggestion that Chaparro's story was a "government conspiracy." The prosecution is not allowed to make such claims. *United States v. Gracia*, 522 F.3d 597, 602 (5th Cir. 2008). A prosecutor, though, is allowed to argue "inferences and conclusions she wishes the jury to draw from the evidence so long as those inferences are grounded upon evidence." *United States v. Munoz*, 150 F.3d 401, 414–15 (5th Cir. 1998). In this case, the prosecutor recounted the story that Chaparro himself told and asked jurors to decide if it was believable. We see no similarity between those statements and a prosecutor's assertion that "in order to find appellants not guilty, the jury would have to believe that several governmental agencies and even perhaps federal judges had engaged in a malevolent and illegal conspiracy to convict them." *United States v. Goff*, 847 F.2d 149, 164 (5th Cir. 1988).

Chaparro also challenges two fact statements made by the prosecutor. First, the prosecutor said, "There is no evidence that there is any surveillance video." Second, the prosecutor argued that one of the photos of Chaparro showed markings that looked like they were from a backpack. Chaparro says that both comments were improper because they were not based on facts admitted into evidence. *United States v. Mendoza*, 522 F.3d 482, 491 (5th Cir. 2008).

Indeed, there was no surveillance video taken the night of February 1, 2018, in the record. The witness to whom Chaparro points concerning

surveillance video had suggested only that surveillance video could be taken by the thermal imaging device. The witness did not suggest that the Government had such video or deleted it. In post-trial hearings, the Government stated that these videos are deleted by Border Patrol no later than one week after being recorded. At trial, though, there was no evidence of surveillance video. Moreover, the photos could have shown backpack markings. It was up to the jury to decide, but it is not error for a prosecutor to highlight evidence and suggest the inferences and conclusions she wishes the jury to draw from that evidence. *Munoz*, 150 F.3d at 414–15. These statements and the question were not improper.

AFFIRMED.